597 A.2d 489

**Peter Lenox ALLEN and David Alexander Allen**

v.

**STATE of Maryland.**

**No. 1649, Sept. Term, 1990.**

Court of Special Appeals of Maryland.

Oct. 30, 1991.

Certiorari Denied Feb. 12, 1992.

Kathleen M. Brown, Assigned Public Defender (Stephen Harris, Public Defender, Baltimore, on the brief), for appellant, Peter L. Allen.

Robert J. Morrissey (Morrissey, Morrissey & Morrissey, P.C., on the brief), Bowie, for appellant, David A. Allen.

Richard B. Rosenblatt, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore, and Alexander Williams, Jr., State's Atty. for Prince George's County, Upper Marlboro, on the brief), for appellee.

Submitted before CATHELL, DAVIS and MOTZ, JJ.

MOTZ, Judge.

During 1989, the Prince George's County Police Department conducted a comprehensive investigation of appellants, Peter Lenox Allen (Peter) and David Alexander Allen (David), and others who were alleged to run a criminal enterprise for the purpose of the sale of cocaine. The investigation culminated in the Allen brothers being indicted for various narcotics-related crimes. After several days of hearings, appellants' motions to suppress were denied. Appellants were then tried by a jury in the Circuit Court for Prince George's County (Johnson, J.) and convicted of all charges.

Peter was sentenced to a term of 30 years imprisonment without parole, ten years suspended, and a fine of $30,000, $10,000 suspended, for being a drug "kingpin"; a concurrent 20–year term of imprisonment for importation of cocaine; a concurrent 20–year term of imprisonment for use of a minor in drug distribution; and a consecutive term of ten years, without parole, five years suspended, for possession with intent to distribute in a large quantity. David was sentenced to a term of 20 years imprisonment, ten years suspended, for conspiracy to import; and a concurrent 20–year term, ten years suspended, for conspiracy to distribute.

On appeal, reversal is urged on five grounds. Both brothers assert:

1. The trial court improperly denied their motions to suppress evidence derived from wiretap interceptions.

2. The verdict against them was tainted by improper communications with the jury.

In addition, Peter claims:

3. There was insufficient evidence to support his conviction under the drug "kingpin" statute.

4. The trial court erred in holding his protestations of innocence against him at sentencing.

Finally, David claims:

5. The trial court erred in imposing separate sentences for his two conspiracy convictions.

Facts relevant to each issue are set forth as necessary below.

## I. *Suppression of Evidence*

In the spring of 1989, a confidential informant and casual police observation suggested to officials in the Prince George's County police department that Peter Allen might be involved in the distribution of narcotics. In early July, 1989, the department began a full-scale investigation into Peter Allen's activities, including surveillance of his home. Among the vehicles that investigators observed parked in front of the house on various occasions was a car belonging to David Allen, Peter's brother. It soon became apparent to investigators that David lived with Peter. Over the ensuing weeks, detectives continued their surveillance of both Peter and David, frequently following them and watching for drug-related activity.

Investigators also began a series of "trash rips," *i.e.*, recovery and analysis of the trash placed on the curb in front of Peter Allen's house. Among the items recovered from the trash, which corroborated growing suspicion that the brothers were involved in narcotics distribution, were trace amounts of cocaine from discarded plastic bags, wrappers useful for packaging large amounts of money, ammunition, assorted bank statements and records, and other materials. In addition, detectives employed dialed number recorders ("DNRs") on Peter Allen's home telephone, tracking the numbers and locations of telephones which were in communication with that telephone. The police then conducted background checks of the telephone numbers and persons who called Peter Allen's house.

In October, 1989, the police applied for an *ex parte* court order authorizing electronic surveillance of Peter Allen's home telephone and car telephone. In two affidavits, each over one-hundred pages in length, investigators detailed the nature of their probe and their objectives for placement of

the wiretap on the telephones. The objectives of the electronic surveillance, according to the affidavits, were to determine the dates, times and places of drug importation into and distribution throughout Maryland; the locations of drugs stashed for future distribution; the prices charged and paid by conspirators; the use of monies emerging from the drug transactions; and the identities of persons previously unknown who dealt drugs with Peter Allen and with other known suspects.

On October 25, the circuit court granted the state's request for wiretaps on both of Peter Allen's telephones. The court directed that the electronic surveillance be terminated by November 24, or upon achievement of the state's objectives, whichever shall occur first. On October 30, the court extended the order to incorporate the monitoring of conversations dealing with homicides and robberies. The wiretaps terminated on Friday, November 10, 1989, when both brothers, as well as several other alleged co-conspirators, were arrested. On Monday, November 13, in the presence of the circuit court, the investigators placed the tapes generated from the surveillance into a sealed box, pursuant to Md.Cts. & Jud.Proc.Code Ann. § 10–408(g) (1984 Repl.Vol., 1991 Supp.). The next day, again in the presence of the circuit court, they opened the box for the purposes of adding written monitor logs; the box was then resealed and retained by the court.

At a hearing on the motion to dismiss on March 27, 1990 the prosecutor unsealed the box. It became immediately apparent that, contrary to the mandate of § 10–408, the petition, affidavits and order for the wiretap were not included in the box. After a search for the missing documents, it was discovered that the judge who issued the *ex parte* electronic surveillance order had inadvertently left them on a shelf in his office. Called to testify at the motions hearing, that judge stated that he placed the materials on his shelf immediately after they were signed by the detectives in November and they remained there, within nine inches of his chair, until that morning. After remov-

ing dust which had accumulated on the materials and reading them for possible tampering, the judge testified that "there have been no changes, no alterations, no modifications at all" to the material. The defendants' motion to suppress the tapes was then denied.

On appeal, appellants claim that admission of the tapes was contrary to Maryland's wiretap statute, Md.Cts. & Jud.Proc.Code Ann., §§ 10–401 to 10–412 (1984 Repl.Vol., 1991 Supp.). The Maryland statute is an offspring of the Omnibus Crime Control and Safe Streets Act of 1968, Pub.L. No. 90–351, tit. III, § 802, codified at 18 U.S.C. §§ 2510–2520 (commonly referred to as "Title III"). The statutory provisions in both the state and federal statutes that require a wiretap order to conform to specific minimum guidelines are those that are perceived to contain minimum safeguards to constitutional rights. *State v. Bailey*, 289 Md. 143, 154, 422 A.2d 1021 (1980).[1]

Almost universally, other states that have based their own wiretapping statutes on Title III permit introduction into evidence of information acquired through electronic surveillance, if there is substantial compliance with the statute and no prejudice is shown. *See Howard v. State*, 51 Md.App. 46, 60, 442 A.2d 176 (1982). Maryland, however, distinguishes between the statutory conditions that apply before or during the interception (preconditions) and those that apply after the termination of the interception (postconditions). *Id.*, 51 Md.App. at 61, 442 A.2d 176; *see also State v. Bailey*, 289 Md. at 154, 422 A.2d 1021. A defect in the State's adherence to postconditions will not vitiate the order if there has been substantial compliance and no prejudice to the defendant shown; on the other hand, a defect with respect to preconditions will void the order and cause suppression of the evidence. *Poore v. State*, 39 Md.App. 44, 53–54, 384 A.2d 103 (1978); *see also Howard v. State*, 51

---

1. Title III controls only in those instances in which it is more restrictive than the Maryland wiretap statute. *Nye v. State*, 49 Md.App. 111, 117, 430 A.2d 867, *cert. denied*, 291 Md. 780 (1981).

**34**

Md.App. at 61, 442 A.2d 176.[2] Appellants make two precondition challenges and two postcondition challenges.

## 1. The Exhaustion Requirement

First, appellants claim that, prior to obtaining the wiretap order, the State failed to demonstrate that alternative investigative techniques had been exhausted or would have been futile. An application for an order authorizing the interception of electronic communications must contain "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." Md.Cts. & Jud.Proc.Code Ann. § 10–408(a)(3). *See also Vandegrift v. State*, 82 Md.App. 617, 626–27, 573 A.2d 56, *cert. denied*, 320 Md. 801, 580 A.2d 219 (1990). The underlying purpose of this precondition is to guard against the use of electronic surveillance as an initial investigative tool. *Vandegrift*, 82 Md.App. at 627, 573 A.2d 56; *Bell v. State*, 48 Md.App. 669, 674–75, 429 A.2d 300, *cert. denied.*, 291 Md. 771 (1981). Here, appellants are not arguing that the State's preliminary investigation was insufficient to warrant the issuing of an electronic surveillance order. Rather, they assert that the State's investigation was so exhaustive as to negate any further need to wiretap the suspects. Appellants point to the DNRs, trash rips, surveillance and use of confidential sources as being "successful in obtaining a great deal of information both about parties involved and physical evidence of drug involvement."

It has been held under Title III, the federal counterpart of the Maryland wiretap statute, that "where tradition-

---

**2.** The reason that Maryland courts are more tolerant of non-compliance by the State with the post-intercept provisions of the Maryland wiretap statute is that those provisions, while important to the accused, are thought not to be as vital to their Fourth Amendment Rights as pre-intercept violations. *See Baldwin v. State*, 45 Md.App. 378, 380, 413 A.2d 246 (1980), *aff'd*, 289 Md. 635, 426 A.2d 916, *cert. denied*, 454 U.S. 852, 102 S.Ct. 295, 70 L.Ed.2d 144 (1981).

al techniques could have led to the successful infiltration of the entire enterprise," a wiretap order will not be granted. *United States v. Simpson*, 813 F.2d 1462, 1472–73 (9th Cir.), *cert. denied*, 484 U.S. 898, 108 S.Ct. 233, 98 L.Ed.2d 192 (1987). Moreover, courts are not free to infer from the mere presentation of an application or petition, supported by an affidavit, that normal investigative procedure will not work. *Calhoun v. State*, 34 Md.App. 365, 376, 367 A.2d 40 (1977). On the other hand, if the application demonstrates "to the issuing judge that normal investigative measures have been tried and failed," it is sufficient. *Id.* at 377, 367 A.2d 40. The State "need not exhaust every conceivable investigative possibility before seeking a wiretap order." *Salzman v. State*, 49 Md.App. 25, 33, 430 A.2d 847 (1981).

Here our independent review of the record and the extensive affidavits persuade us that the appellants' contentions as to exhaustion are meritless. The State adequately demonstrated that alternate investigative techniques had been exhausted. The State aspired to learn the full scope of the conspiracy under investigation, including the identity of all persons conspiring with Peter Allen; the manner in which the conspirators handled the monies involved with their distribution of narcotics; the dates, times and places of the transport of drugs into and throughout Maryland; and the locations of the conspirators' drug stashes. The affidavits describe in detail the surveillance, trash rips, and other techniques that had been used and were considered by the police, and explain why these techniques were inadequate. For example, stationery surveillance was soon spotted and mobile surveillance quickly evaded. Similarly, the examination of telephone records and DNRs indicated that the defendants were making sophisticated use of all communication devices to insulate themselves from the law enforcement officers, but, of course, did not indicate the precise conspiracy or conspirators or any other particulars of the drug transactions. Moreover, the timing of an effective search warrant was virtually impossible without additional intelligence provided by telephone interception, and would

not, in any event, satisfy the objective of the investigation to identify all confederates, stash houses and sources of supply.

■ Thus, the State's objectives, as identified in its application seeking the court order, called for means of investigation beyond the traditional techniques. Where, as here, the objective of an investigation is to seek evidence regarding "higher-ups," co-conspirators, and sources of supply in a drug distribution network, the inadequacy of traditional techniques of investigation is more than sufficient basis on which to comply with the exhaustion requirement. *Vandegrift*, 82 Md.App. at 628, 573 A.2d 56.

2. Full and Complete Statement of the Facts

■ Next, the Allens assert that the application submitted by the State failed to meet the statutory requirement of "a full and complete statement of the facts and circumstances relied upon by the applicant, to justify his belief that an order should be issued." Md.Cts. & Jud.Proc.Code Ann. § 10–408(a)(2). They argue that "numerous incidents were either left out entirely or misrepresented" in the State's application. They point out that the detective stated in his affidavit that Peter Allen engaged in more than one episode of anti-surveillance driving, but only described one incident in support of that assertion. The Allens further contend that the detective neglected to report both appellants' sources of income and failed to report that several searches of Peter Allen's car were conducted in which no drugs were found. "Such gaps in the information provided to the issuing judge," according to the appellants, "interfered with [the judge's] ability to make the probable cause determinations required by Cts. & Jud.Proc. § 10–408(c)."

In fact, Maryland's wiretap statute does not mandate a complete narrative of everything discovered during the course of its investigation. Rather, it requires that, upon oath or affirmation and with authority to make the application, the affiant, as necessary, will provide: (1) details as to

the particular offense that has been, is being, or is about to be committed; (2) a particular description of the nature and location of the facilities from which or the place where the communication is to be intercepted; (3) a particular description of the type of communication sought to be intercepted; and (4) the identity of the person, if known, committing the offense and whose communications are to be intercepted. Md.Cts. & Jud.Proc.Code Ann. § 10–408(c)(2). This rule has not been interpreted as obligating the State to stress to the court particulars and events which may mitigate, but in no way eliminate, the incriminating evidence the State has found. Accordingly, the State's application for an order permitting electronic surveillance of Peter Allen's phones complies with Maryland's wiretap statute.

3. Initial Sealing of the Tapes

■ The Allens' first "postcondition" challenge is that the State erred in its failure to seal immediately the tape recordings generated from its electronic surveillance of the Allens on Friday, November 10, 1989, the day they were arrested. Very late that night, which was Veteran's Day, the chief detective in the investigation contacted a circuit court judge and informed him that the surveillance had terminated. The judge instructed the detective that he would be unavailable over the weekend, but that the tapes would be sealed on Monday, November 13. The tapes were, in fact, sealed that Monday in the presence of the judge. The following day, the box containing the tapes was reopened (for the purpose of adding monitor logs) and then resealed before the judge.

Appellants charge that the State violated the provision of Maryland's wiretap statute which mandates that, "immediately" upon termination of electronic surveillance, tape recordings generated from the investigation "shall be made available to the judge issuing such order and sealed under his directions." Md.Cts. & Jud.Proc.Code Ann. § 10–408(g)(1). By allowing the tapes to remain in the chief detective's car and at various locations at police head-

quarters over the weekend, the appellants argue, the State failed to meet this requirement. They assert that the State may have easily "altered the tapes or suppressed any exculpatory evidence."

With respect to the initial sealing requirement, we hold that the State adhered not only to the spirit but also to the letter of the law. By contacting the judge at the end of its investigation, the State "made available" the tapes to the judge; the following Monday, the tapes were in fact "sealed under his directions." We do not see how the State could have followed the statute's provisions more closely. In any event, violation of this sealing requirement would not, as explained below, require reversal. *See* Md.Cts. & Jud.Proc. Code Ann., § 10–408(g)(3).

### 4. Failure to Seal Petition, Affidavits and Order

■ Appellants' final argument is that the issuing court's inadvertent failure to seal the petition, affidavits and order permitting electronic surveillance in the box along with the actual tape recordings requires reversal. As explained above, the materials in question remained on the shelf in the ordering judge's chambers from October 25, 1989, the day the wiretap order was issued, through March 27, 1990, the day the tapes were unsealed at a motions hearing. Appellants urge that the "totally unsealed condition" of the materials "over many months" violates Md.Cts. & Jud.Proc. Code Ann., § 10–408(g)(2) *and* requires reversal.[3] In mak-

---

**3.** It is true that the State is obligated to guard the physical integrity of tape recordings made while conducting electronic surveillance. "[T]he seal is a means of ensuring that ... the Government has no opportunity to tamper with, alter, or edit the conversations that have been recorded." *United States v. Ojeda Rios,* 495 U.S. 257, 110 S.Ct. 1845, 1849, 109 L.Ed.2d 224 (1990). Under Title III, violations of the sealing requirement will be grounds for excluding tapes only where the government fails to provide a "satisfactory explanation" of the mistake based on an objectively reasonable, though not necessarily correct, interpretation of the sealing provision. *Id.* 110 S.Ct. at 1850–51. We believe that the State provided a "satisfactory explanation" as to why the petition, affidavit and order were not sealed. Moreover,

ing this assertion, however, they disregard § 10–408(g)(3) of the statute, which directs that a violation of the sealing requirements identified in § 10–408(g)(2) is punishable as contempt only, "and is not remediable by a suppression of the evidence under § 10–408(i)." *Nye v. State,* 49 Md.App. 111 at 122, 430 A.2d 867 (1981).[4] Reversal on these grounds, accordingly, is not warranted.

## II. *Improper Juror Communications*

Appellants' trial on the merits began on June 18, 1990. On the morning of June 26, the jury retired to consider the various charges against the Allens and their codefendant. At that time, the alternate jurors were dismissed. By late that afternoon, the jury had not reached a verdict. The jurors were sent home with instructions to return the following morning to continue their deliberations. Prior to their departure, the trial judge cautioned the jurors, as he had repeatedly during the trial, against discussing the case among themselves or with anyone else.

On the morning of June 27, the foreperson of the jury presented a note, which was stapled shut and marked "eyes only" to the trial judge. The note informed the judge that, the previous day, David Allen ate breakfast with one of the dismissed alternate jurors; that the alternate juror called one of the sitting jurors that evening and told her that David Allen "admitted selling drugs, but not for Peter"; that the sitting juror told the foreperson about the telephone call; and that the foreperson, without alerting any of the other jurors, was now informing the judge of the

the tapes themselves *were* sealed in a manner consistent with the Maryland wiretap statute and/or federal law.

**4.** Given the circuit judge's testimony at the motions hearing that "it's my mistake" that the documents in question were not sealed, a contempt order would hardly be reasonable.

telephone conversation.[5] The judge conducted the following *voir dire* of the jurors who received the *ex parte* information.

First, the court questioned the juror who had spoken to the dismissed alternate juror.

THE COURT: ... I understand that you said that you talked to a dismissed alternate juror last night.

JUROR: Uh–huh. [Meaning yes.]

THE COURT: First of all, why would you do that? I gave you strict instructions—

JUROR: I didn't talk to her about the case. What we talked about when she first called she told me that she—

THE COURT: Why didn't you stop it right there? I gave you strict instructions ... You were not to discuss this any further from that moment when I [dismissed] you for the evening until I got you in the box this morning and you returned to the jury room to resume your deliberations. For the life of me I can't understand this. So tell me, what was discussed?

JUROR: Just exactly what she [the foreperson] said.

THE COURT: Tell me in your own words what was discussed.

JUROR: She [the alternate dismissed juror] told me that she had went to breakfast with the Defendant David Allen and that he admitted selling drugs but not for Peter Allen. I told her I had to go, I couldn't talk to her about this because I was still on the case. That is exactly what happened.

THE COURT: ... I must ask you this and I want you to search your mind and your conscience. Does this in any way affect your deliberations in this case?

JUROR: No.

THE COURT: Are you sure?

---

**5.** For unexplained reasons, the actual note is not to be found in the record of the case. This account of the note is based on its description in the transcript.

JUROR: I'm positive.

THE COURT: Can you still be fair and impartial?

JUROR: Yes. My decision was made yesterday about Dave.

THE COURT: I don't want to know what your decision is. I just want to know can you be fair and impartial during the remaining of these deliberations?

JUROR: Yes.

\* \* \* \* \* \*

THE COURT: ... Was any other Defendant's name mentioned in any way?

JUROR: After she said that I got off the phone. No.

\* \* \* \* \* \*

THE COURT: I know that the foreman knows about this. Is there anyone else on this jury panel that knows about this?

JUROR: No.

THE COURT: No one else on the panel knows about it?

JUROR: No.

The court then conducted the following *voir dire* of the foreperson:

THE COURT: ... Where were you when this was related to you this morning? Did anyone else hear?

JURY FOREPERSON: No one heard. No one. That's true. I took great pains to make sure nobody could see or hear what was going on.

THE COURT: I appreciate that. It was all stapled up and closed and said "For my eyes only." .... I must ask you, does this in any way affect your deliberations?

JURY FOREPERSON: Personally for me, none.

THE COURT: Do you feel that you can still be fair and impartial with respect to each of the Defendants?

JURY FOREPERSON: Yes, sir.

Counsel for the prosecution and the defense witnessed the *voir dire* of the two jurors and, immediately thereafter, all three defendants moved for a mistrial. The court denied

**42**

their motions and, without informing the remaining jurors of the breakfast conversation or telephone call, instructed the jury to continue its deliberations. The jury returned with a verdict that afternoon, finding Peter and David guilty on all counts and their co-defendant not-guilty on all counts. On appeal, both brothers assert that the trial court erred in denying their motions for a mistrial. They charge that the extrinsic evidence acquired by at least two jurors deprived them of a "fair and impartial outcome."

The potency of the Sixth Amendment right to a fair trial relies on the promise that a defendant's fate will be determined by an impartial fact finder who depends solely on the evidence and argument introduced in open court. *See Patterson v. Colorado,* 205 U.S. 454, 462, 27 S.Ct. 556, 558, 51 L.Ed. 879 (1907). Indeed, the notion that a jury's verdict shall be based exclusively on the evidence offered at trial "goes to the fundamental integrity of all that is embraced in the constitutional concept of trial by jury." *Turner v. Louisiana,* 379 U.S. 466, 472, 85 S.Ct. 546, 549, 13 L.Ed.2d 424 (1965). Moreover, it is a "fundamental tenet of our legal system" that, to be impartial, the fact finder must presume the innocence of the criminal defendant. *Wright v. State,* 312 Md. 648, 652, 541 A.2d 988 (1988) (*citing Johnson v. State,* 227 Md. 159, 163, 175 A.2d 580 (1961)). That two jurors here were privy to extrinsic information which referred directly to the ultimate question of the appellants' innocence, therefore, is an extremely serious matter.

 It has, however, been repeatedly held that "a trial judge shall declare a mistrial only under extraordinary circumstances and where there is a manifest necessity to do so." *Wilhelm v. State,* 272 Md. 404, 429, 326 A.2d 707 (1974); *Russell v. State,* 69 Md.App. 554, 562, 518 A.2d 1081 (1987). The record must compellingly demonstrate "clear and egregious prejudice to the defendant" to warrant such a drastic measure. *Leak v. State,* 84 Md.App. 353, 358, 579 A.2d 788 (1990). *See also Lusby v. State,* 217 Md. 191, 195, 141 A.2d 893 (1958). Because a trial judge is in the best

position to evaluate whether or not a defendant's right to an impartial jury has been compromised, an appellate court will not disturb the trial court's decision on a motion for a mistrial or a new trial absent a clear abuse of discretion. *Wright v. State,* 312 Md. 648, 654, 541 A.2d 988 (1988); *Hunt v. State,* 312 Md. 494, 500–01, 540 A.2d 1125 (1988); *Wilhelm v. State,* 272 Md. at 429, 326 A.2d 707. With these principles in mind, we consider the claims here that denial of the motions for mistrial was error.

■ First, we note that all evidence in the record indicates that David deliberately behaved in a manner that led to the alleged jury taint. For this reason, the widely cited "invited error" doctrine may, in and of itself, provide grounds for denial of David's motion for mistrial. "Invited error" is the shorthand term for the concept that a defendant who himself invites or creates error cannot obtain a benefit—mistrial or reversal—from that error. *See, e.g., Tracy v. State,* 319 Md. 452, 458, 573 A.2d 38 (1990); *Reed v. State,* 78 Md.App. 522, 536, 554 A.2d 420 (1989). The rule has been extended to a number of situations in which a defendant disputes decisions initially prompted or condoned by his or her own actions, including cases, arising in other states, that involve extrinsic evidence being considered by the jury.

For example, in *State v. Bonaparte,* 222 Neb. 469, 384 N.W.2d 304 (1986), the Supreme Court of Nebraska declined to grant a new trial to a defendant who approached a juror during his trial, offered her a ride home, then drove her by the scene of his arrest and discussed the case with the juror. The court held that the defendant's call for a new trial out of concern for the integrity of the judicial system represented "the height of 'chutzpah.' " *Id.,* 384 N.W.2d at 305. "It would be a strange, if not ridiculous, rule of law which would hold that a criminal defendant may be entitled to a new trial based upon jury misconduct when such misconduct is initiated by the defendant himself." *Id.,* 384 N.W.2d at 306. Similarly, in *Phillips v. State,* 443 So.2d 1328 (Ala.Crim.App.1983) the Alabama Court of Criminal

Appeals refused to grant a new trial to a defendant who, prior to and during the trial, contacted a nonjuror friend and persuaded the friend to contact a juror. While the contents of the discussions between the defendant's friend and the juror were disputed, the court refused to grant a new trial because the defendant "certainly cannot be allowed to benefit by his own misconduct." *Id.,* 443 So.2d at 1331. "To allow such," it said, "would be absurd." *Id.*[6]

Here, we have one juror's *voir dire* testimony that she was contacted by a dismissed alternate juror who had eaten breakfast with appellant, David Allen, on the morning that the jury retired to deliberate his case. We also have the testimony of the jury's foreperson that the first juror promptly informed the foreperson of the unsolicited information. The substance of David's conversation with the dismissed alternate juror, as related by the dismissed alternate to the sitting juror, was that David admitted selling drugs, although he denied being part of a conspiracy with his brother and codefendant, Peter Allen. David, of course, is under no obligation to comment on this alleged conversation.[7] David's haste to take advantage of the improper extrinsic evidence, without ever denying that he was its source, cannot, however, be overlooked. *See Garrett v.*

---

**6.** The Court of Appeals in Georgia reached the same conclusion in *Garrett v. State,* 153 Ga.App. 366, 265 S.E.2d 304 (1980), where a defendant directed his sister to contact and persuade a juror that the defendant should not be " 'sent up' for an insignificant occurrence where no one was hurt." *Id.,* 265 S.E.2d at 307. Because the contact with the juror in *Garrett* was induced by the defendant and designed to benefit the defendant, the court refused to grant a new trial. This "invited error" principle was also applied in *State v. Adams,* 27 Ariz.App. 389, 555 P.2d 358, 361 (1976) (defendant, who initiated contact with a juror during trial, and who did not show prejudice resulting from the contact, was "at least partially responsible for the error" and therefore not eligible for new trial) and in *Gerlach v. State,* 466 So.2d 75, 79 (Miss.1985) (defendant's failure to object during trial to continued presence on jury of member who had been exposed to extrinsic evidence prohibits subsequent appeal on issue).

**7.** We note that in Peter Allen's *pro se* Motion to Supplement Brief, he states "co-appellant Dave Allen apparently had breakfast with a dismissed alternate juror."

*State*, 153 Ga.App. 366, 265 S.E.2d 304 at 307 (1980) (when defendant did not contradict or rebut juror's testimony that defendant's relatives contacted him at defendant's behest, contact with juror thereafter viewed as error induced by defendant). This is particularly so here because David or his counsel, had the opportunity to deny that this conversation took place to the trial judge, out of the jury's presence, without, in any way, prejudicing David's case. Thus, there seems to be no reason why such a denial would not have been made *if* the conversation had not taken place.

David was present during the trial court's numerous admonitions to the jury not to speak with anyone; his own fortune at stake, he was fully aware of the solemnity of the jury's mission. Nevertheless, he apparently deliberately disregarded the spirit of the judge's orders by eating breakfast with the alternate juror. Such actions were not simply unwise; they were arrogant and irresponsible. Indeed, David's own behavior apparently lead to the error he now claims in the jury process.

As noted within, several courts have held that when alleged improper jury contact originates in, or is induced by the defendant himself, denial of a mistrial is appropriate on that ground. Indeed, we have not found a single case in which improper jury contact, initiated by a defendant, has been held to require a new trial. Moreover, most of the cases in which courts relied upon the "invited error" doctrine in refusing to grant a new trial involved convictions of crimes at least as serious as those at issue here. *See, e.g., Phillips v. State*, 443 So.2d at 1330 (defendant convicted of "robbery wherein a person was intentionally killed," a capital offense, and sentenced to life without parole); *State v. Adams*, 27 Ariz.App. 389, 555 P.2d 358 at 359 (1976) (conviction of assault with a deadly weapon, aggravated battery and possession of a pistol by a criminal). Furthermore, in each of those cases, the "invited error" doctrine was applied even though, unlike the case at hand, the contacted juror did not bring the matter promptly to the attention of the trial judge. In those cases the trial judge did not have the

opportunity afforded here to question the contacted jurors thoroughly in order to be certain, prior to any verdict, that the extraneous evidence would not affect the verdict. Thus, in many respects, the cases from other jurisdictions provide persuasive precedent for invocation of the "invited error" doctrine here.[8]

On the other hand, there are two important differences between the cases from other states and the case at hand. First, while the extrinsic evidence considered in those cases was generally favorable to the defendants, here it was, of course, not favorable to David. Second, despite the recklessness exhibited by David in meeting with a dismissed alternate juror, he may have truly believed that the information he shared would not be transmitted further, let alone to a sitting member of the jury. For these reasons, we do not rest our holding, as to the propriety of the circuit court's denial of David's motion for mistrial, on the invited error doctrine alone, but rather turn to a consideration of whether, in any event, the jury contact was prejudicial.

■■■■ It is well established in Maryland that in determining whether jury contact is prejudicial, a trial court must balance the "probability of prejudice from the face of the extraneous matter in relation to the circumstances of the particular case." *Harford Sands, Inc. v. Groft*, 320 Md. 136, 138–39, 577 A.2d 7 (1990) (*quoting Wernsing v. General Motors Corp.*, 298 Md. 406, 411, 470 A.2d 802 (1984)). Where the record affirmatively shows prejudice by improper communications, the error requires reversal; but where the record affirmatively shows no prejudice, reversal is not required. *See Eades v. State*, 75 Md.App. 411, 422–

---

8. The alternate juror's testimony as to her conversation with David would undoubtedly have been admissible as an admission on retrial if the mistrial had been granted. Whether or not the extrinsic evidence would have been admissible at trial has also been considered in determining whether a mistrial should be granted because of extraneous evidence. *See, Commonwealth v. Santiago*, 456 Pa. 265, 318 A.2d 737, 740 (1974) (mistrial granted because admission of extrinsic evidence at trial would have constituted reversible error).

23, 541 A.2d 1001, *cert. denied*, 313 Md. 611, 547 A.2d 188 (1988). *See also Smith v. Phillips*, 455 U.S. 209, 217, 102 S.Ct. 940, 946, 71 L.Ed.2d 78 (1982) (due process does not require a new trial every time a juror has been placed in a potentially compromising situation). If the record does not show whether the error prejudiced the defendant, prejudice is presumed, and the burden falls on the state to rebut the presumption of harm.[9] *Id.; see Remmer v. United States*, 347 U.S. 227, 229, 74 S.Ct. 450, 451, 98 L.Ed. 654 (1954). The decision as to whether the State has met this burden is committed to the trial court's discretion and, like other motions for mistrial or new trial, will be reversed only upon a finding of abuse of that discretion. *Harford Sands*, 320 Md. at 146, 577 A.2d 7. *See also Joseph F. Hughes & Co., Inc. v. Stockhausen*, 212 Md. 559, 563, 129 A.2d 844 (1956) (question as to whether contact with jurors requires a new trial is "left to the sound discretion of the trial court, whose decision will only be disturbed in those cases where there has been a plain abuse of discretion, resulting in palpable prejudice").

 Here, the affected jurors made absolutely no attempt to hide the extraneous information. Rather, they promptly and discreetly reported it to the trial judge. The judge then conducted a thorough and careful *voir dire* on the issue. He asked both jurors if the extrinsic information

---

**9.** Maryland follows Lord Mansfield's rule and thus "it is well settled that a juror [in Maryland] cannot be heard to impeach his own verdict." *Harford Sands*, 320 Md. at 145, 577 A.2d 7 (*quoting Wernsing*, 298 Md. at 411, 470 A.2d 802). Here, the problem of post-verdict impeachment is not at issue because the *voir dire* of the affected jurors occurred *prior* to the delivery of a verdict. In other words, the trial court's examination of the jurors and conclusion that they would not be prejudiced by the extrinsic information will not be disregarded on the grounds that the *voir dire* violated Maryland's strict verdict impeachment prohibition. Moreover, notwithstanding Maryland's very strict prohibition against juror impeachment, courts which have looser guidelines regarding post-verdict impeachment yield helpful guidance regarding when extrinsic evidence will be found sufficiently prejudicial to warrant a new trial. *See Wernsing*, 298 Md. at 419, 470 A.2d 802.

"in any way affected (their) deliberations" and if they could still be "fair and impartial." Both jurors stated that their deliberations would not be affected by the extrinsic evidence *and* that they could remain fair and impartial. Both also testified that no other jurors had learned of the extrinsic information.[10] Because the trial judge "has a unique opportunity to observe the jurors during trial," *Dickson v. Sullivan*, 849 F.2d 403, 405 (9th Cir.1988), we are unwilling to second guess the trial judge's conclusion that the jurors in this case could legitimately continue their deliberations. Accordingly, we hold here, as we did in *Eades v. State*, 75 Md.App. at 423–24, 541 A.2d 1001, that the trial judge did not abuse his discretion in denying the motions for mistrial because the judge's inquiry and the jurors' responses thereto effectively overcame the presumption that the jury's deliberations would be prejudiced by the extrinsic evidence.

This decision is consistent with the holdings of analogous cases in other jurisdictions. *See, e.g., Gerlach v. State*, 466 So.2d 75, 79 (Miss.1985) (after judge intensively interrogated juror during murder trial regarding anonymous phone call informing juror that defendant had once "put a contract out on a man," judge's determination that juror understood her obligation to disregard call and decide the case solely on evidence presented in open court upheld); *Dudley v. State*, 179 Ga.App. 252, 345 S.E.2d 888, 891 (1986) (judge's decision, on basis of juror's *voir dire* answers, that fact that victim's brother told juror that defendant "shot my sister," would not influence juror's deliberations upheld); *Sher v. Stoughton*, 666 F.2d 791, 795 (2d Cir.1981) (trial judge's careful and prompt *voir dire* and curative instructions, coupled with its finding that jury had not been improperly

---

**10.** One major determinant regarding whether a new trial is granted due to the intrusion of extrinsic evidence is that of how many jurors are affected. Where potentially prejudicial extrinsic evidence has reached an entire jury, courts have proven far more likely to grant a motion for mistrial or new trial. *See e.g., State v. Glover,* 159 Ariz. 291, 767 P.2d 12, 15 (1988); *State v. Blackwell,* 664 S.W.2d 686, 689 (Tenn.1984); *Owens v. State,* 251 Ga. 313, 305 S.E.2d 102, 110 (1983); *People v. Bannerman,* 59 A.D.2d 719, 398 N.Y.S.2d 370, 372 (1977).

influenced by anonymous phone calls urging defendant's conviction, held sufficient to deny defendant's motion for new trial).

 Moreover, with regard to Peter, it is also clear that he was not prejudiced by the extraneous matter which David allegedly transmitted to the alternate juror and which she, in turn, transmitted to the sitting juror, *i.e.*, that David sold drugs, "but not for Peter." Indeed, this statement exculpated rather than inculpated Peter. The general rule is that a trial court may reasonably find that extrinsic evidence that actually assists a defendant's case is not prejudicial to him and, therefore, not sufficient ground upon which to direct a mistrial. *See, e.g., Carpenter v. United States,* 475 A.2d 369, 376 (D.C.App.1984) (brief, sympathetic conversation between juror and witness found not prejudicial on basis that, if conversation influenced the juror at all, it could have only influenced her in favor of defendant, who was found guilty); *State v. Olin,* 103 Idaho 391, 648 P.2d 203, 211 (1982) (trial court did not abuse discretion in refusing to grant new trial where conversation between juror and defendant's cousin was sympathetic toward defendant); *State v. Bonaparte, supra,* 384 N.W.2d at 306; *Garrett v. State, supra,* 265 S.E.2d at 307; *State v. Adams, supra,* 555 P.2d at 361. On this basis alone, the trial court's refusal to grant Peter a new trial must be affirmed.

Finally, the overwhelming evidence presented in this case against both defendants negates the possibility that, in the absence of the extrinsic evidence, the jury would have reached another conclusion. As will be discussed, *infra,* there was sufficient evidence to support Peter's conviction under Maryland's "drug kingpin" statute. With respect to the other charges against Peter and David involving conspiracy and distribution of drugs, the State's case was more than sufficient to warrant a verdict of guilty. The jury heard numerous witnesses—including former confederates and accomplices of the Allen brothers—testify that they observed or participated in the defendants' drug operations. Law enforcement officials with extensive experience in the

field confirmed that the appellants' actions over a four month period were consistent with acknowledged drug trafficking practices. The State submitted hundreds of pieces of demonstrative evidence to substantiate its case. Moreover, several hours of tape recordings were presented, in which the jury overheard the Allens conversing and scheming to distribute drugs. In sum, even in the absence of the unfortunate intrusion of extraneous evidence during the course of the jury's deliberations, the jury would not have found differently.

### III. *Conviction Under the "Drug Kingpin" Statute*

■ We turn next to Peter Allen's assertion that there was insufficient evidence for the jury to convict him as a "drug kingpin" under Md.Ann.Code art. 27, § 286(g) (1987 Repl.Vol., 1991 Supp.). The Maryland Drug Kingpin Act was enacted in 1989 as a result of growing state-wide concern over the proliferation of narcotics distribution and drug abuse in Maryland. *See* Governor's Commission for Drug & Alcohol Abuse, *Maryland Drug and Alcohol Abuse Control Plan* (1989). The Act sets forth a variety of measures specifically designed to apprehend and punish the "higher ups" in drug distribution networks, including mandatory minimum sentences for the so-called "drug kingpin"; a law making it a separate felony to use a firearm during a drug trafficking crime; and increased jurisdiction of law enforcement officers conducting drug-related investigations. *See* Department of Legislative Reference, *Session Review* V–6 (1989). The statute defines a drug kingpin as:

> a person who occupies a position of an organizer, supervisor, financier, or manager as a coconspirator in a conspiracy to manufacture, distribute, dispense, bring into, or transport in the State controlled dangerous substances.

Art. 27, § 286(g)(1). The statute further mandates that persons convicted under this provision are subject to imprisonment for not less than 20, nor more than 40 years without the possibility of parole; in addition, a court may not impose

less than 20 years imprisonment, no part of which may be suspended. Art. 27, § 286(g)(2)(ii).

Peter Allen directs us to the federal counterpart of Maryland's drug kingpin statute, the Federal Comprehensive Drug Abuse Prevention and Control Act of 1970 (codified with subsequent amendments at 21 U.S.C. § 841 *et seq.*), for guidance regarding the question of when a defendant will be regarded as a "kingpin." He argues that evidence presented at trial "supported, at best, the finding that he was a co-conspirator but failed to establish the requisite element of control" necessary for conviction. The extent of his relationship with his co-conspirators, Peter argues, was that of "buyer-seller," which, under federal law, is insufficient basis on which to deem a party a "kingpin." *United States v. Butler,* 885 F.2d 195, 201 (4th Cir.1989).

Like the Maryland law, the Federal kingpin statute was designed in part to apply to ringleaders of large-scale illegal narcotics operations. *See United States v. Webster,* 639 F.2d 174, 180 (4th Cir.) *cert. denied,* 454 U.S. 857, 102 S.Ct. 307, 70 L.Ed.2d 152 (1981). While many provisions of the federal law differ from the Maryland statute, the federal statute provides a very similar definition of "drug kingpin," designating as such a person who "occupies a position of organizer, a supervisory position, or any other position of management" within a continuing criminal enterprise. 21 U.S.C. § 848(c)(2)(A). Given the relative newness of the Maryland statute, coupled with its similarity both in purpose and in language to the federal law, the precedent emerging from federal courts regarding drug kingpins may be instructive with respect to interpretation of the Maryland law.

Under federal case law, more than a buyer-seller arrangement must exist in order for a party to be recognized as a "drug kingpin." *United States v. Butler,* 885 F.2d 195, 201 (4th Cir.1989); *United States v. Apodaca,* 843 F.2d 421, 426 (10th Cir.), *cert. denied,* 488 U.S. 932, 109 S.Ct. 325, 102 L.Ed.2d 342 (1988). As pointed out in *Apodaca,* a mere buyer-seller relationship, without more, is insufficient to

establish that a defendant exercised a managerial position or posture of control necessary to meet the definition of "drug kingpin." 843 F.2d at 426. The terms "organize," "supervise," and "manage," however, are read disjunctively, meaning that, to find that a party acted as a kingpin, "it is only necessary that any one of these . . . relationships be shown to exist between the defendant and a particular underling or associate." *Butler,* 885 F.2d at 200 (interpreting 21 U.S.C. § 848); *Apodaca,* 843 F.2d at 426 (same). Moreover, these terms "are to be given their ordinary meaning . . . and the person need not have been the *dominant* organizer or manager as long as he or she was in a managerial position." *United States v. Wilkinson,* 754 F.2d 1427, 1431 (2d Cir.), *cert. denied,* 472 U.S. 1019, 105 S.Ct. 3482, 87 L.Ed.2d 617 (1985) (*citing United States v. Mannino,* 635 F.2d 110, 116–17 (2d Cir.1980); *United States v. Losada,* 674 F.2d 167, 174 (2d Cir.), *cert. denied,* 457 U.S. 1125, 102 S.Ct. 2945, 73 L.Ed.2d 1341 (1982)).

We need not decide in this case if these federal principles are equally applicable to the Maryland statute or if state law requires less rigorous proof (*e.g.,* a kingpin need only act as "conspirator" to sell drugs). This is so because even assuming the federal principles are applicable here, it is clear that the evidence against Peter Allen sufficiently demonstrated that he was not just a co-conspirator, but also an organizer, manager, and supervisor, in addition to serving as a "financier," the additional term found in Maryland's statute. Specifically, the State presented witnesses who testified that they participated in the narcotics operation under Peter Allen's supervision. For example, Peter's sister-in-law testified that, in repayment for $1500 he loaned her, she transported large quantities of money contained in sandwich bags from Washington, D.C. to New York on about 15 different occasions. In each of these transactions, the witness followed Peter's instructions with respect to how to handle the packages she carried. Moreover, another witness testified that he "used to sell drugs for [Peter]." According to that witness, Peter would supply him with

cocaine to sell, and the witness did not have to compensate Peter in full after selling the drugs. As pointed out by the State, this relationship suggests that Peter was a "financier" of drugs.

Not all the witnesses presented by the State who conspired with Peter to sell drugs admitted that Peter was their organizer, manager, supervisor, or financier. The tape-recorded conversations, however, corroborated a conclusion that Peter, in fact, was a leader of a drug operation, rather than a mere player with no greater authority than the others. The tapes played at trial allowed the jury to hear Peter organizing the times, locations, and prices at which drugs were to be sold. There was clearly sufficient evidence for the jury to find that Peter Allen was, indeed, a "drug kingpin."

### IV. *Sentencing Issues*

Finally, each brother asserts that he was unlawfully sentenced. Peter Allen claims that the sentencing judge improperly considered Peter's own statement, included in the presentence investigation report, *i.e.,* that the police got the wrong man, in imposing sentence. This claim fails for two reasons. First, although the trial judge, early in the sentencing proceedings, did comment that this statement was "outrageous" in view of all the evidence, there is absolutely no indication that the sentence imposed was motivated by any improper consideration. Indeed, the drug kingpin statute, as explained above, requires a *minimum* sentence of twenty years in prison; the trial court imposed a term of thirty years imprisonment, but suspended ten years. Furthermore, even if Peter's voluntary post-trial statement was considered by the trial judge, such consideration was not error. *See Atkins v. State,* 40 Md.App. 461, 464, 391 A.2d 868 (1978), *cert. denied,* 284 Md. 741 (1979).

David Allen, who was sentenced to concurrent terms for his convictions of conspiracy to import cocaine and conspiracy to distribute cocaine, argues that these convictions should merge. The State properly concedes the

point. *See Vandegrift,* 82 Md.App. at 645, 573 A.2d 56; *see also Tracy v. State,* 319 Md. 452, 459, 573 A.2d 38 (1990) (only one sentence can be imposed for common law conspiracy no matter how many criminal acts the conspirators have agreed to commit; unit of prosecution is the agreement or combination rather than each of its criminal objectives).

SENTENCE FOR CONSPIRACY TO IMPORT COCAINE VACATED.

JUDGMENTS OTHERWISE AFFIRMED.

APPELLANTS TO PAY COSTS.