REPORTED

IN THE COURT OF SPECIAL APPEALS
OF MARYLAND

No. 1800

September Term, 2012

_____

DEBRA COOCH

v.

S&D RIVER ISLAND, LLC, ET AL.

_____

Eyler, Deborah S.,
Nazarian,
Moylan, Charles E., Jr.
 (Retired, Specially Assigned),

JJ.

_____

Opinion by Moylan, J.

_____

Filed: February 27, 2014

There is a venerable body of law, of which <u>Wernsing v. General Motors Corp.</u>, 298 Md. 406, 470 A.2d 802 (1984), is the avatar, seeking to preserve the advantages of finality and repose in jury verdicts once rendered. There is a counter body of law, of which <u>Jenkins v. State</u>, 375 Md. 284, 825 A.2d 1008 (2003), is the more recent avatar, dedicated to rooting out jury verdicts that are tainted. There is unquestioned merit in both philosophies. At times, however, they meet in tectonic collision.

There is an understandable tendency in those moving for new trials on the basis of tainted verdicts to wrap themselves in the mantle of <u>Jenkins</u> (and several criminal cases in its slip stream) and to pay faint heed to the long procession of opinions in the <u>Wernsing v. General Motors</u> tradition. There is a counter tendency, as the State opposes the retrial motions, to exalt the pedigree of <u>Wernsing</u> and to give scant, if not disdainful, notice to <u>Jenkins</u>. Opposing advocates sometimes challenge an appellate court to flip a coin between conflicting and seemingly irreconcilable approaches. There has to be a better way.

## A Plague of Bedbugs

The appellant, Debra Cooch, a public school custodian and a grandmother, was a longtime resident of the River Front Apartments in Savage, Maryland. She rented her apartment, in a 12-unit apartment building, from one of the appellees, S&D River Island, LLC. The other appellee, Rolling Park Management, LLC, managed the apartment complex. Between March and July of 2010, bedbugs that had initially appeared on the third floor of the building found their way into the appellant's apartment.

The appellant promptly reported the infestation to the appellees. On three occasions over the next four weeks, a pest control company treated the appellant's apartment with pesticides. The human counterattack was to no avail. The appellant stopped sleeping in her bed and retreated to a couch. The bedbugs followed. The appellant made numerous complaints to the Howard County Code Enforcement Office. Ultimately, under a barrage of complaints the appellees terminated the appellant's lease. Concerned that her personal belongings were actually or potentially infested but unable to secure a treatment that would give her a 100% guarantee that her belongings would be free of bedbugs, the appellant left her furniture in the apartment when she moved out. She discarded many other belongings before moving in with her daughter. Her daughter incidentally forbade the appellant to bring any of her furnishings into the daughter's home.

On November 12, 2010, the appellant filed suit in the Circuit Court for Howard County against the appellees, claiming that she had suffered both personal injury and property damage as a result of the appellees' negligence in failing to rid her apartment of the bedbugs. A three-day trial followed before Judge Richard S. Bernhardt and a jury on August 20-22, 2012. At the trial, the core of the controversy was over the property damage. Judge Bernhardt instructed the jury, inter alia, that the plaintiff has a duty to make reasonable efforts to reduce the damages. On August 22, the jury returned its verdict. The jury found 1) that the appellees owed a duty of reasonable care to the appellant; 2) that the appellees breached that duty of care; but 3) that there was no causative connection between

that breach and the injury suffered by the appellant.  Having found no liability, the jury did not consider the question of damages.  With respect to the third question, that of "causation," the Verdict Sheet in its entirety showed:

3.  <u>Causation</u>:

Was there a direct and substantial connection between the actions or omissions of S&D River Island, LLC and Roland Park Management, LLC, Inc. and the injuries to Debra Cooch?

Yes _____   No __x__

**The Motion For A New Trial**

The trial was adjourned and the jury dismissed.  Daniel W. Whitney, Esq., attorney for the appellant, was, shortly after the trial adjourned, standing near the stairs in the parking lot in front of the court house entrance.  He noticed a group of jurors walking in his direction.  He asked the group if they were willing to talk to him, reminding them that they were under no obligation to do so.  Most continued walking to their cars, but one, known to us only as A.B., was willing to discuss the case.

It is through the affidavit of Daniel Whitney in support of the new trial motion that we know what A.B. said.[1] It is skimpy, indeed. When Whitney asked, "What can you tell me?," A.B. replied that the jury had found both a duty and a breach thereof, but that "Debra Cooch shouldn't have discarded her property." A.B. further volunteered that he "did some online research" and "found out that there are companies that provide fumigation services." A.B. concluded that "it wasn't necessary to throw her stuff away." With respect to the appellant's claim for bodily injury, A.B. said that he did not believe her injuries were "life threatening." Whitney thanked A.B. for speaking to him and then walked to his own car. He had no contact with A.B. after August 22, 2012. That brief exchange is the sum total of the appellant's case that the jury verdict, finding no causation and awarding no damages, was the result of the impropriety on the part of juror A.B. in conducting online research.

On August 30, 2012, the appellant filed a Motion for Partial New Trial "as to damages only." Two paragraphs of the motion bore on the allegedly improper conduct of juror A.B.

> 1. At least one juror's decision not to award any property damages was based on Internet research he performed during trial concerning mitigation of a bed bug infestation through fumigation. This egregious misconduct prejudiced Plaintiff. Such information was not presented in Court

---

[1]There is also an affidavit from Jeffrey C. Shipley, Esq., co-counsel for the appellant, who joined Whitney's conversation with A.B. and heard most of it. It adds nothing, however, to the Whitney affidavit.

as a mitigation option available to the Plaintiff. Elimination of bed bugs by fumigation would have been inadmissible at trial without foundational testimony that such a process was reasonably available in Howard County in 2010, approved by a County Code Enforcement Officer, allowed by the landlord and economically feasible.

.....

3.      Plaintiff's motion for a partial new trial must be granted because at least one juror improperly obtained information from the Internet, which improperly influenced the jury, and therefore unfairly prejudiced Plaintiff.

(Emphasis supplied).

The appellant filed a Memorandum in Support of Plaintiff's Motion for Partial New Trial. On September 15, 2012, the appellees filed their Defendant's Opposition to Plaintiff's Motion for Partial New Trial. On October 15, 2012, Judge Bernhardt issued his Order denying the partial new trial motion. This appeal followed.

## An Insignificant Nuance

There is a procedural nuance in this particular case that makes no difference to the ultimate outcome, but is unusual and may, therefore, be worthy of note. The information

being proffered to establish a juror's impropriety was, directly at least, from the affidavit of a non-juror, the attorney Daniel Whitney. Whitney, however, had no direct knowledge of the alleged impropriety. He was simply the conduit for knowledge from the juror A.B. A.B. was the source of the allegedly verdict-impeaching evidence.

That the actual source of the allegedly impeaching evidence was a hearsay declarant rather than an actual or proffered witness is, however, immaterial. The source of the evidence, direct or indirect, was a juror. Our analysis will proceed, therefore, on the basis of a juror's offering evidence to impeach the jury's verdict. See Dorsey v. State, 185 Md. App. 82, 110, 968 A.2d 654 (2009) ("Asking the jurors directly about their deliberations, or asking a third-party to provide hearsay testimony about the jury deliberations, would have constituted an inquiry into the validity of the verdict.").

### A Doctrine of Creditable Vintage

The body of law controlling this case is, if not ancient, at least unimpeachably venerable. It did not begin with the Court of Appeals decision in Wernsing v. General Motors. Judge Rodowsky simply picked up the torch from Lord Mansfield. It was William Murray, first Earl of Mansfield and Lord Chief Justice of the King's Bench, who decided the case of Vaise v. Delaval, 1 T.R. 11, 99 Eng. Rep. 944, in 1785. There was an affidavit there, on a motion to set aside a verdict, from two jurors "who swore that the jury, being divided in their opinion, tossed up (presumably flipping a half crown or at least a farthing), and that the plaintiff's friends won." Lord Mansfield declined to receive the affidavit, pointing out

that any juror who even offered such information would be guilty of "a very high misdemeanor" and further observing that "in every such case the Court must derive their knowledge from some other source: such as from some person having seen the transaction through a window, or by some such other means." It is now a time-honored principle that is with justification still called Lord Mansfield's Rule.

In McDonald v. Pless, 238 U.S. 264, 268, 35 S. Ct. 783, 59 L. Ed. 1300 (1915), the United States Supreme Court described the origin and impact of Lord Mansfield's Rule.

> Prior to 1785 a juror's testimony in such cases was sometimes received, though always with great caution. In that year Lord Mansfield, in Vaise v. Delaval, 1 T.R. 11, refused to receive the affidavit of jurors to prove that their verdict had been made by lot. That ruling soon came to be almost universally followed in England and in this country.

(Emphasis supplied).

The first appellate decision in Maryland to recognize Lord Mansfield's Rule was Browne v. Browne, 22 Md. 103 (1864).[2] After a verdict had been rendered, four separate jurors submitted affidavits stating that one of the jurors had been suffering during the course of the trial from a painful disorder of the bowels. That juror swore that he voted for a verdict with which he disagreed only "in order to obtain his release from the confinement of the jury room." Three other jurors swore that they voted for the verdict with which they

_____

[2]The principle was earlier briefly referred to in a note to Bosley v. Chesapeake Insurance Company, 3 Gill & Johnson 450, 473 (1831).

- 7 -

disagreed "for the purpose of relieving" their ailing colleague. The Court of Appeals was adamant that such juror impeachment of their verdict should not be allowed.

> To allow a verdict of a jury solemnly rendered, to be afterwards impeached upon such testimony, would, we think, be setting a dangerous precedent, tending in most cases to the defeat of justice. Although in some of the States a different practice has been allowed, we think the law in Maryland is well settled, that "the testimony of jurors cannot be heard to impeach their verdict, whether the conduct objected to in the jury be misbehaviour or mistake."

22 Md. at 113 (emphasis supplied). The Court further pointed out that the exclusion of such testimony "is supported, not only by the authority of adjudged cases in England and in this country, but by sound reason and public policy." 22 Md. at 114. The Court of Appeals concluded emphatically:

> To permit [the verdict] now to be impeached, by an inquiry into the motives of jurors for assenting to it, would be clearly against public policy, tending to overthrow the safeguards of trial by jury, and in most cases defeat justice by exposing every verdict to impeachment.

Id. (emphasis supplied).

The next reported Maryland decision to deal with the subject was Brinsfield v. Howeth, 110 Md. 520, 73 A. 289, in 1909. A juror in that case submitted an affidavit charging that he had only voted for a verdict with which he disagreed because other members of the jury had threatened him, cursed at him, and otherwise pressured and intimidated him. The Court of Appeals affirmed the decision of the trial judge not to receive the evidence at a hearing on a motion for a new trial. "The rule, which obtains in nearly all the states, is that a juror will not be permitted to impeach his verdict. It prevails both in

England and in the federal courts." 110 Md. at 530. Quoting with approval from 14 Ency. Pleading & Practice 906, the Court of Appeals explained the policy behind the rule.

> Such evidence is forbidden by public policy, since it would disclose the secrets of the jury room, and afford an opportunity for fraud and perjury. It would open such a door for tampering with weak and indiscreet men that it would render all verdicts insecure, and therefore the law has wisely guarded against all such testimony and has considered it unworthy of notice. It would be a most pernicious practice, and in its consequences dangerous to this much-valued mode of trial, to permit a verdict, openly and solemnly declared in the court, to be subverted by going behind it and inquiring into the secrets of the jury room.

110 Md. at 530-31 (emphasis supplied).

The hard core of Lord Mansfield's Rule has consistently been that a juror will not be permitted to impeach his own verdict. Over the decades, Maryland routinely applied that core principle. In Kelly v. Huber Baking Co., 145 Md. 321, 125 A. 782 (1924), the charge was made by a juror that he had been improperly approached by a friend of the defendant. In rejecting the evidence, the Court of Appeals held:

> In that affidavit Todd attempted to impeach his own verdict. For that purpose it was clearly inadmissible, and while the facts which it embodies, if true, would be sufficient to warrant appropriate proceedings to punish the persons who attempted to discredit the administration of justice by improperly influencing the verdict of the jury, under no circumstances could the affidavit be considered for the purpose for which it was offered at the hearing of the motion for a new trial.

145 Md. at 328-29 (emphasis supplied).

In Oxtoby v. McGowan, 294 Md. 83, 101, 447 A.2d 860 (1982), the charge was that a medical book had been improperly brought into the jury room and had been examined by the jurors. In rejecting the evidence, the Court of Appeals noted:

> Regardless of the rule in other jurisdictions, in Maryland it is well settled that a juror cannot be heard to impeach his verdict, whether the jury conduct objected to be misbehavior or mistake.

(Emphasis supplied). See also Christ v. Wempe, 219 Md. 627, 642, 150 A.2d 918 (1959) ("The proffered testimony [of] jurors in the instant case as to what took place in the jury room was properly not received."); Aron v. Brock, 118 Md. App. 475, 512-27, 703 A.2d 208, cert. denied, 346 Md. 629, 697 A.2d 913 (1997); Dixon v. State, 27 Md. App. 443, 447-49, 340 A.2d 396, cert. denied, 276 Md. 741 (1975) ("Maryland, however, has not deviated from the rule that what occurs in the jury room, generally, remains in the jury room."); Dorsey v. State, 185 Md. App. 82, 100-11, 968 A.2d 654 (2009).

## Lord Mansfield's Rule: Procedural Fine-Tuning

In pristine form, Lord Mansfield's Rule is simply that a juror will not be permitted to impeach the jury verdict of which he had been a part. In application, of course, the simple rule is not always so simple. Would someone other than a juror, for instance, be permitted to impeach a jury's verdict? Would the juror himself be prohibited from testifying about the improprieties of himself or other jurors that occurred outside the courtroom or would the prohibition be limited to conduct in the jury room or in the course of deliberations? How about the possible impact that an outside impropriety might have had on the vote the juror

himself cast?  Suppose, moreover, the impropriety had been trivial and inconsequential. From the predicate of an impropriety, may dispositive prejudice be presumed or must it be proved by the party seeking to impeach the verdict?

Quite obviously, the basic instrument of the rule called for some procedural fine-tuning.  For Maryland, Wernsing v. General Motors, supra, was the seminal case for retrofitting the venerable principle with up-to-date procedures.  In Wernsing, the jury impropriety in issue was that a dictionary had been improperly introduced into the jury room by the court bailiff at the request of the jury foreman.  The dictionary's definitions of "proximate," "proximately," and "legal" were out of sync with the trial judge's definition of "proximate cause" and that was the key issue in the case.

## A.  What Sources of Information Are Permissible?

In Wernsing, information about the introduction of the dictionary into the jury room came from four types of source: 1) affidavits from four separate jurors; 2) testimony by a bystander who heard the foreman and two other jurors conversing, post-verdict, about the dictionary and the role it played in securing a unanimous verdict; 3) the testimony of the bailiff who delivered the dictionary to the jury; and 4) certain notes made by several of the jurors during their deliberations.  The Court of Appeals carefully distinguished permissible sources from impermissible sources.  The Court ruled that the four affidavits from jurors themselves could not be received.

> The post-verdict affidavits in the instant case are a particularly gross example
> of soliciting a reconstruction of a juror's mental processes in reaching the

verdict. This is precisely the type of attempted undermining of verdict finality which Maryland law does not permit.

298 Md. at 411-12. The affidavit from the bystander also could not be considered. Albeit not a juror himself, he quoted what jurors said about their deliberative process, making them the indirect sources of impeaching information.

> The affidavit by the participant in the post-verdict conversation between certain jurors attempts to prove the truth of the content of the statements made by the foreman in that conversation. Even if we assume the affidavit is otherwise admissible, it falls within the prohibition described above.

298 Md. at 412.

> The testimony of the bailiff, by contrast, was completely admissible. He was not a juror and he was not revealing anything about jury deliberations.

> On the other hand, the testimony of the bailiff presents "a different situation" and is competent.

298 Md. at 413. The admissibility of the notes left in the jury room is also interesting.

> Similarly, the jury notes ... are competent proof. As documents generated during the jury's deliberations, they do not suffer the taint of possible post-verdict importuning.

Id. See also Christ v. Wempe, 219 Md. 627, 642, 150 A.2d 918 (1959).

In Harford Sands, Inc. v. Groft, 320 Md. 136, 577 A.2d 7 (1990), the Court of Appeals engaged in the same meticulous sorting of those sources permitted to offer evidence of jury infractions and the sources not so permitted. The infraction in that case was that a juror, Carroll O'Keefe, on a luncheon break and in violation of an instruction not to do so, had talked to workers at a construction site near the courthouse and had discussed with them

- 12 -

the capabilities of concrete pumping machines. Four additional affidavits were proffered from persons other than the juror.

Affidavits from two construction workers about the lunchtime conversation were permitted. They dealt with an extraneous matter occurring outside the jury room, to wit, a conversation at the construction site. One affidavit from trial counsel describing a post-trial conversation with the juror O'Keefe, on the other hand, was not permitted. In that conversation, O'Keefe had described himself as "the strongest proponent of the defendants' position on the jury." The Court of Appeals also did not countenance an affidavit from a spectator at the trial who swore she had discussed the trial with O'Keefe after it was over and he had told her that he was "the strongest member of the jury." Those forbidden conversations described O'Keefe's role in the jury deliberations. The cordon sanitaire of Lord Mansfield's Rule insulated from review anything that a juror may have been thinking in the course of deliberating a verdict. The information offered by the juror himself was partly in and partly out, as will be discussed infra in the next sub-section.

## B. The Precise Nature of A Juror's Testimony

As the implementing procedures are more finely tuned, even the prohibition on verdict-impeaching testimony from a juror himself loses its apparent simplicity. It is sometimes in and sometimes out. More precisely, it is sometimes partly in and partly out. If the juror's testimony is about an extraneous infraction, even one by the juror himself, that took place outside the jury room, the court is willing to receive such evidence from the juror.

- 13 -

It is deemed to be "extraneous matter." What is absolutely prohibited is testimony from a juror that bears directly on the deliberative process itself. The juror is, therefore, barred from testifying as to what effect any information learned in the course of the infraction may have had on the juror's own decision as well as on the decisions of other jurors.

In Harford Sands, Inc. v. Groft, the juror who committed the infraction by going, during a luncheon break, and talking to a construction worker about issues in the case was Carroll O'Keefe. The Court of Appeals held that the testimony from O'Keefe that "he had talked to workers at the construction site during the lunch break ... and that he had discussed with them the capabilities of concrete pumping machines" was receivable at the hearing on the new trial motion. That, even from the juror himself, was extraneous matter and, therefore, admissible. 320 Md. at 141. His testimony, by contrast, about what "we debated in the jury room" was prohibited. 320 Md. at 142.

In Smith v. Pearre, 96 Md. App. 376, 625 A.2d 349, cert. denied, 332 Md. 454, 632 A.2d 151 (1993), the infraction occurred when the jury foreman disobeyed the order of the court and watched on television a segment on "60 Minutes" that bore on the subject matter at issue in the trial. Although the jury foreman was barred from testifying about anything that was said during jury deliberations and even about any effect that "60 Minutes" exposure may have had on his own decisional process, he was not barred from testifying about the infraction itself which had occurred outside the jury room.

The jury foreman's observance of the program constitutes extraneous material that occurred outside the sanctity of the jury room. Therefore,

- 14 -

evidence of the foreman's observance of the program may be properly considered by the trial court, but the court may not consider what occurred during jury deliberations.

96 Md. App. at 390 (emphasis supplied).

## C.  The Proof of Prejudice

It was also with respect to the proof of prejudice that Wernsing firmly established the prevailing procedure – at least in civil cases.  An infraction is not enough.  Christ v. Wempe, 219 Md. at 642 ("Every act on the part of a juror (or court official) during the course of a trial, even though irregular, may not amount to such misconduct as requires a new trial."). Wernsing was firm that prejudice will not be presumed but must be proved.

> We reject the rule which presumes prejudice solely from delivery of a dictionary into the jury room without the consent of the court and all parties. The result of such a rule in Maryland would be to overturn verdicts automatically in nearly all cases where this irregularity occurs.  The reason is that the party opposing a new trial would almost never be able to demonstrate the absence of harm from the presence in the jury room of the extraneous material, because jurors may not be interrogated concerning their deliberations in order to impeach the verdict.  It is true that some courts permit juror affidavits for the purpose of sustaining a verdict; but that is not Maryland practice.

298 Md. at 416 (emphasis supplied).  Judge Rodowsky's opinion then elaborated on why Maryland does not indulge a presumption of prejudice.

> Further, a presumption of prejudice from the unauthorized presence of a dictionary is inconsistent with the rule we apply when, in the course of trial and before the jury retires, it is learned that a juror has received information concerning the case from a source outside of the record.  In those circumstances prejudice is not presumed; rather the test is "whether the conversations were 'of such a nature that their effect must fairly be held to have been to deprive the injured party of a fair and impartial trial.'"

- 15 -

Id. (emphasis supplied).

On a new trial motion based on jury misconduct, it is the trial judge who must decide whether the admissible evidence establishes a probability of prejudice. The trial judge's decision will then be assessed on an abuse of discretion standard.

> The Court of Special Appeals clearly identified the problem in the instant case. It is to balance the right to a fair trial with the policy prohibiting impeachment by a juror of the verdict. Where, as here, the precise extraneous matter is known but direct evidence as to its effect on the deliberations is not permitted, a sound balance is struck by a rule which looks to the probability of prejudice from the face of the extraneous matter in relation to the circumstances of the particular case. It is the function of the trial judge when ruling on a motion for a new trial to evaluate the degree of probable prejudice and whether it justifies a new trial. That judgment will not be disturbed but for an abuse of discretion.

Id. at 419-20 (emphasis supplied).

In Smith v. Pearre, a medical malpractice case, the jury foreman, in direct violation of the court's order not to do so, on an overnight recess during the trial listened to a television segment on "60 Minutes" that could have had a direct bearing on the issue before the court. On the issue of prejudice, this Court held that there is no presumption of prejudice. It must be proved.

> [W]e conclude that while it was possible that the "60 Minutes" segment influenced the jury foreman we are not convinced that it probably resulted in prejudice. We find no abuse of discretion in the trial court's decision to deny a motion for new trial.

96 Md. App. at 391 (emphasis in original).

It was here, on the proof of prejudice, that there ultimately developed the rift between Lord Mansfield's Rule in a civil trial and Lord Mansfield's Rule in a criminal trial that has become essentially unbridgeable. The criminal cases have taken off on a path of their own.

## Maryland Rule 5-606(b)

The substance of Lord Mansfield's Rule has been, as of July 1, 1994, encapsulated in Maryland Rule 5-606(b), which provides:

> (b) **Inquiry into Validity of Verdict.** (1) In any inquiry into the validity of a verdict, a sworn juror may not testify as to (A) any matter or statement occurring during the course of the jury's deliberations, (B) the effect of anything upon that or any other sworn juror's mind or emotions as influencing the sworn juror to assent or dissent from the verdict, or (C) the sworn juror's mental processes in connection with the verdict.

> (2) A sworn juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying may not be received for these purposes.

> (3) Notes made under Rule 2-521(a) or Rule 4-326(a) may not be used to impeach a verdict.

## Inapt Analogies

A particularly treacherous analytic snare that should be carefully avoided is easy reliance on cases that share the alluring common factor of a jury infraction but that do not truly engage the gears of Lord Mansfield's Rule. When a jury infraction is discovered before a verdict has been rendered (or at any time before the jurors have ultimately dispersed), there is no bar to a juror's giving evidence about the infraction. The sanctity of an enrolled verdict is in no way involved. There is no repose to be protected. The extreme sanction is a

mistrial, thus preventing a final verdict from even being rendered. The proof or presumption of prejudice is by no means the same, because curative measures and tools for further investigation are still available that are not available in cases engaging Lord Mansfield's Rule. Jurors and others can be investigated with respect to the infraction. Each and every juror can be examined, by the judge or otherwise, as to any possible influence the infraction may have had on that juror's thinking. Curative instructions may be given. Alternate jurors may be called upon to fill a gap. We are not dealing with the disruption of a final judgment.

Except for the enticing common factor of the initial infraction itself, the two situations are completely unlike. Analogizing, though tempting, is treacherous. In a case involving Lord Mansfield's Rule, the careful analyst should, therefore, avoid reliance on cases involving such pre-verdict infractions as Wardlaw v. State, 185 Md. App. 440, 971 A.2d 331 (2009). See also Johnson v. State, 423 Md. 137, 31 A.3d 239 (2011); Stokes v. State, 379 Md. 618, 843 A.2d 64 (2004); State Deposit Insurance Fund Corp. v. Billman, 321 Md. 3, 580 A.2d 1044 (1990); Summers v. State, 152 Md. App. 362, 831 A.2d 1134, cert. denied, 378 Md. 619, 837 A.2d 929 (2003); Allen v. State, 89 Md. App. 25, 597 A.2d 489 (1991), cert. denied, 325 Md. 396, 601 A.2d 129 (1992); Eades v. State, 75 Md. App. 411, 541 A.2d 1001, cert. denied, 313 Md. 611, 547 A.2d 188 (1988). It is dangerous to analogize when the circumstances are not analogous.

In the case before us, for instance, the appellant relies heavily on Wardlaw v. State, supra, and its use of presumptive prejudice. That, however, was a case where the trial judge

did not voir dire the jury after the infraction had been discovered and, therefore, erroneously denied a motion for a mistrial. In this case, by contrast, such curative measures were not a possibility. In Wardlaw, moreover, finality was not being jeopardized and there was no necessity to balance competing sets of values. The situations are not comparable. A hasty analogy would be a false analogy.

Allen v. State was one of those cases where the infraction was discovered before a verdict had been rendered and various curative measures were not foreclosed by Lord Mansfield's Rule. Judge Motz for this Court pointed out how very different the two procedural postures are:

> Maryland follows Lord Mansfield's Rule and thus "it is well settled that a juror [in Maryland] cannot be heard to impeach his own verdict." Here, the problem of post-verdict impeachment is not at issue because the voir dire of the affected jurors occurred prior to the delivery of a verdict. In other words, the trial court's examination of the jurors and conclusion that they would not be prejudiced by the extrinsic information will not be disregarded on the grounds that the voir dire violated Maryland's strict verdict impeachment prohibition.

89 Md. App. at 47 n.9 (emphasis supplied). See also Aron v. Brock, 118 Md. App. 475, 526, 703 A.2d 208 (1997).

Indeed, in Eades v. State, 75 Md. App. at 419, Judge Karwacki carefully noted the difference between these two very different contexts:

> Because the court in the case sub judice elicited juror Skinner's statements during his interview of the individual jurors immediately following the return of their verdict, juror Skinner's response to the court's question did not run afoul of Lord Mansfield's rule. It was therefore properly received and considered.

- 19 -

(Emphasis added and in original). Eades was a case of "Lord Mansfield's Rule inapplicable." A careless or unscrupulous advocate could easily cite it as a case of "Lord Mansfield's Rule satisfied." It is wise to steer clear of such a minefield.

### Jenkins v. State and Presumptive Prejudice

The appellant relies heavily on Jenkins v. State, 375 Md. 284, 825 A.2d 1008 (2003), and the idea that once an infraction of the rules regulating the jury has been shown, prejudice may be presumed. The appellant may well be reading her own wishful thinking into the Jenkins opinion. Jenkins was a criminal case. As we shall be discussing, infra, over the course of the last 50 years and affecting far more than the handling of Lord Mansfield's Rule in Maryland, a sea change has occurred in the law's thinking about criminal procedure that to some extent has driven a wedge between civil trials and criminal trials that was not always present. The appellant's trial was a civil one and for that reason her reliance on Jenkins may be inapt.

In the Jenkins case, there was a weekend break in the trial. Without any prior planning and without even knowing each other in advance, a police witness, Detective Patrick Pikulski, and one of the jurors, Bruce McDonald, were scheduled to attend the same two-day religious retreat. On Friday night of the retreat and recognizing Detective Pikulski, Juror McDonald introduced himself, "Look, you don't know who I am, but I'm a juror in a case that you testified in, and I can't have any dealings with you." They did not discuss the case in any way. At a seminar the next morning, they were accidentally seated next to each

- 20 -

other.  After the seminar was over, they did go to lunch together.  According to them, their

conversation over lunch focused on McDonald's employment in environmental matters and

Detective Pikulski's son's schooling in chemistry and interest in the environment.  Both

denied ever discussing the case.

When that initially accidental but nonetheless improper contact was brought to the

trial judge's attention at the post-verdict new trial motion hearing, the judge, in a written

opinion, denied the motion.  He found that the contact had initially occurred inadvertently

but that it was nevertheless contrary to his instructions and was improper.  In detailed

findings, he ruled that Jenkins had not actually been prejudiced by the contact.  The case was

appealed to this Court.  In Jenkins v. State, 146 Md. App. 83, 806 A.2d 682 (2002), this

Court affirmed.  In her opinion, Judge Deborah Eyler held that there was neither clear error

nor an abuse of discretion.

> Our review of the record reveals that the trial court's factual findings
> concerning the issue of prejudice were supported by competent evidence and
> were not clearly erroneous; that its second-level factual finding that the
> appellant's due process rights were not harmed by the contact likewise was
> supported by the evidence and was based in reason; and that its decision to
> exercise discretion to deny the appellant's motion for new trial was sound and
> not abusive.

146 Md. App. at 111 (emphasis supplied).  The Court of Appeals granted certiorari.

Although, at the outset of its opinion, the Court of Appeals announced that it would

"review the trial judge's denial of petitioner's motion for a new trial ... under an abuse of

discretion standard," 375 Md. at 299, it effectively held that under the particular circumstances of that case, the trial judge had no discretion.

> In conclusion, we hold that, under the highly unusual circumstances of the case at bar, <u>in a criminal prosecution</u>, when a juror and a witness have significant and intentional mid-trial personal conversations and contact in violation of court orders, such as having lunch together, <u>there is an inherent, and</u> given the constraints of Maryland Rule 5-606, <u>virtually irrefutable, prejudice to the defendant</u> when, as in the case <u>sub judice</u>, the misconduct is concealed until after the verdict has been rendered and accepted and the jury discharged. <u>We hold that the prejudice in this case was not sufficiently rebutted.</u> We note that <u>it is virtually always improper for witnesses, particularly police witnesses, to go to lunch with a juror during the middle of a trial. As this misconduct was left uncorrected, petitioner did not receive an impartial jury trial</u> as mandated by the United States Constitution and the Maryland Declaration of Rights. Accordingly, we reverse the decision of the Court of Special Appeals.

375 Md. at 340-41 (emphasis supplied). The opinion expressly noted, however, that everything it was saying it was saying in the context of "a criminal prosecution."

From the conduct of the juror and the police witness in prolonging their relationship, even if not discussing the case on trial, <u>Jenkins</u> held that a presumption of prejudice arose. That was a departure from the handling of prejudice in a civil trial context and it is that presumptive prejudice that the appellant seeks to utilize in the case now before us. In employing the device of presumptive prejudice, however, the <u>Jenkins</u> opinion again carefully noted that it was relying heavily on the Supreme Court's decision in <u>Remmer v. United States</u>, 347 U.S. 227, 229, 74 S. Ct. 450, 98 L. Ed. 654 (1954). <u>Remmer</u>, like <u>Jenkins</u>, was a criminal case. It was, moreover, a case involving the fundamental Sixth Amendment right to trial by jury.

- 22 -

> "In a criminal case, any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial[.]"

(Emphasis supplied). Whatever may have been happening with respect to post-verdict revisiting and reopening of criminal convictions, there was no indication that anything comparable was happening in the more tranquil context of civil verdicts.

Indeed, Jenkins did not quarrel with the accepted handling of prejudice in civil cases. Except for a passing footnote on another issue, it never mentioned Wernsing v. General Motors and never mentioned Smith v. Pearre, supra, at all, the leading Maryland cases on proving prejudice under Lord Mansfield's Rule. Wernsing held squarely, 298 Md. at 416, that "a presumption of prejudice ... is inconsistent with the rule we apply when, in the course of trial and before the jury retires, it is learned that a juror has received information concerning the case from a source outside of the record. In those circumstances prejudice is not presumed." Wernsing announced the test that should apply under Lord Mansfield's Rule:

> Where, as here, the precise extraneous matter is known but direct evidence as to its effect on the deliberations is not permitted, a sound balance is struck by a rule which looks to the probability of prejudice from the face of the extraneous matter in relation to the circumstances of the particular case. It is the function of the trial judge when ruling on a motion for a new trial to evaluate the degree of probable prejudice and whether it justifies a new trial. That judgment will not be disturbed but for an abuse of discretion.

298 Md. at 419-20 (emphasis supplied). Wernsing had earlier said, 298 Md. at 416, "[w]e reject the rule which presumes prejudice solely from delivery of a dictionary into the jury

- 23 -

room .... The result of such a rule in Maryland would be to overturn verdicts automatically in nearly all cases where this irregularity occurs."

Smith v. Pearre, in turn, had clearly not indulged in any presumption of prejudice when it held that "while it was possible that the '60 Minutes' segment influenced the jury foreman we are not convinced that it probably resulted in prejudice." 96 Md. App. at 391 (emphasis in original). Jenkins did not challenge in any way the pre-existing Maryland caselaw on proof of prejudice in civil cases. It may, however, have placed a second modality for proving prejudice in the field in the case of criminal verdicts.

### An Attitudinal Change In Revisiting Criminal Verdicts

It should not be at all surprising that a body of law that traditionally placed extremely high values on repose and the finality of cases once decided did not emerge unscathed from the Warren Court Revolution that began in the 1960s. That revolution left the trial of civil cases largely untouched, but it has worked a complete upheaval not only in criminal procedure but in the undergirding attitude we bring to bear on criminal verdicts once seemingly in repose.

Time was for Lord Mansfield's Rule that the distinction between a civil trial and a criminal trial was essentially a distinction without a difference or, at most, a very modest speed bump. As a result of 50 years of radical change in the criminal law, however, that once largely indiscernible difference has become, or is becoming, an ever-widening abyss. To pretend that the abyss is not now there would be foolhardy.

As a result of new post-conviction procedures, writs of habeas corpus federal and state, writs of error coram nobis, and writs of actual innocence, long closed criminal cases are being reopened with regularity. In 6 Lynn McLain, Maryland Evidence, § 606:2(b), at 500-01 (3d ed. 2013), Professor McLain has noted the latter-day ability of constitutional criminal procedure to trump the traditional application of Lord Mansfield's Rule.

> Under Maryland law, the rule is that jury verdicts may be impeached only by evidence independent of jurors' post-verdict statements. Note, however, that in criminal cases, on habeas review by a federal court, the state rule has been held not to preclude post-conviction interviews by the court of jurors, on the theory that the defendant's confrontation right may have been violated by the use of extra-trial materials in the jury room.

(Emphasis supplied).

The shift in attitude has been dramatic. The phenomenon of reopening long closed cases is now not only tolerated, it is celebrated. This shift has inevitably influenced Lord Mansfield's Rule, if not at its core, at least in its implementing procedures such as the proof of prejudice. At the very least, there is a discernible wedge between the handling of a civil verdict and the handling of a criminal verdict.

## A Civil-Criminal Separation Has Undeniably Occurred

That this truly revolutionary upheaval in criminal procedure would work a change in jury impeachment law was inevitable. Wernsing v. General Motors and Jenkins v. State no longer co-exist in a single undivided field. If they do not represent different bodies of law, they represent, at the very least, distinct sub-bodies of law in two different quadrants of what was once, but is no longer, a single undivided field. For purposes of the civil case now

- 25 -

before us, therefore, <u>Jenkins v. State</u> does not apply. Its presumption of prejudice from the very existence of an infraction applies only in criminal cases and this is not a criminal case.

Whatever the permutation of proving prejudice in a criminal trial may turn out to be, it is unnecessary for us to consider it in this civil case. It is enough for us to hold that the modality for proving prejudice in a civil case remains what it always has been.

### Egregiousness Is Not A Burden-Shifting Trigger

Enjoying a presumption of prejudice is far easier than proving prejudice the old-fashioned way, but it represents a diametric reversal of the traditional allocation of the burden of proof. What precisely then is the procedural trigger that can bring about such a reallocation? In looking at the proof of prejudice under Lord Mansfield's Rule, it is clear that such latter-day reallocations of the burden of proof are not to be found among the civil cases. On the criminal side, by contrast, where the prevailing philosophy no longer tolerates allowing a criminal conviction to hide under the foreclosing shroud of finality, the use of presumptive prejudice is being increasingly employed.

In looking for a workable rule that is more than just random, one finds the adjective "egregious" very much in vogue. Though stopping short of promulgating a rule, <u>Jenkins v. State</u>, for instance, stated that, having found the infraction of the jury isolation rule to have been egregious, it would apply the presumption of prejudice.

Egregiousness of the infraction, however, would seem to be a poor trigger for reallocating the burden of proof. We fail to find anywhere in the caselaw or in the academic

commentary any evidence of any correlation between the flagrancy of the infraction and the likelihood of prejudice. A very flagrant infraction – an agent for a litigant attempting to bribe or to intimidate one or more jurors – might ultimately produce very little prejudice or no prejudice at all. A very mild or accidental infraction might, on the other hand, result in severe prejudice. There is no necessary correlation between the flagrancy or egregiousness of the infraction and the virulence of the extraneous information communicated by that infraction.

The only apparent reason for slapping a presumption of prejudice on an egregious infraction would be as a prophylactic device to punish the violators and thereby to deter future violations. This, however, has never been a function of Lord Mansfield's Rule. It has been a rule that focuses on the effect of extraneous information on the jury. It has never been a rule that focuses on the violation or the violator. See, for instance, Kelly v. Huber Baking Co., 145 Md. 321, 328-29, 125 A. 782 (1924) ("[W]hile the facts which it embodies [the infraction], if true, would be sufficient to warrant appropriate proceedings to punish the persons who attempted to discredit the administration of justice by improperly influencing the verdict of the jury, under no circumstances could the affidavit be considered for the purpose" of impeaching the verdict.). Lord Mansfield's Rule is not the Exclusionary Rule. It is not designed to punish wrongdoing, even egregious wrongdoing, and even to write about "the public perception of impropriety" is to lose that focus.

In yet another regard, egregiousness is a clumsy instrument for a trial judge to apply. It is subjective to the point of being arbitrary. When the judge wants to reach a result, he can easily characterize a wide variety of infractions as egregious. When more lackadaisical about the infraction, he can forego the burden-shifting adjective. Egregiousness is in the eye of the beholder and it is too subjective to be a workable distinction.

One need only contrast Jenkins v. State with Harford Sands, Inc. v. Groft, supra, to confirm the disutility of egregiousness as a burden-shifting trigger. In Jenkins the juror and the witness met by accident although they did thereafter prolong their contact. In Harford Sands a juror went out deliberately to talk to construction workers about the very issue that was then before the jury. In Jenkins the witness and the juror never talked about the case. In Harford Sands the inquisitive juror talked at length with the construction workers about the subject matter of the case. In Jenkins the juror never said anything about his meeting to the other members of the jury. In Harford Sands the juror argued for a verdict on the basis of the information he had improperly learned and he described himself as "the strongest proponent of the defendants' position on the jury." The infraction in Harford Sands was 50 times as flagrant as that in Jenkins. In Jenkins, however, the infraction was condemned as egregious. In Harford Sands, a civil case, such a characterization was never employed. In Jenkins prejudice was presumed and, although there was no evidence that any prejudice resulted, that presumption was never rebutted. In Harford Sands prejudice was not presumed and was never proved, although the excluded evidence demonstrated that

- 28 -

significant prejudice may actually have resulted from the infraction. The point is that if the infraction in Jenkins was "egregious" and the infraction in Harford Sands was not "egregious," egregiousness is a useless instrument for triggering a reallocation of the burden of proof on the issue of prejudice. See also Kelly v. Huber Baking Co., 145 Md. at 328-29.

## What Evidence Was Admissible?

Against our now retrofitted version of Lord Mansfield's Rule, we will now measure the appellant's case. The only source of arguably verdict-impeaching evidence is the hearsay declaration of the juror A.B. A.B. actually said five things. Putting those five things under the microscope of Harford Sands, Inc. v. Groft, supra, and Smith v. Pearre, supra, a straight application of Lord Mansfield's Rule or of Maryland Rule 5-606(b) would immediately eliminate three of the five from any further consideration.

The first statement to be eliminated would be A.B.'s response when asked by the appellant's attorney, "What can you tell me?," obviously referring to how the verdict was reached. When A.B. responded that the jury found a duty and a breach of that duty, that was no more than what the verdict sheet showed and was not evidence of any jury impropriety. His further comment, "Debra Cooch shouldn't have discarded her property," however, was getting into the sensitive area of why no damages were awarded. It was, moreover, an insight into the jury's deliberative thinking process, or at least into A.B.'s deliberative thinking process, and was not a proper subject for consideration.

- 29 -

A.B.'s subsequent statement that "it wasn't necessary to throw her stuff away" was also an insight into A.B.'s own deliberative thinking process and was also not a proper subject for consideration. When finally asked about the appellant's claim for bodily injury, A.B.'s statement that he did not believe her injuries were "life threatening" was also a window into how he, and perhaps others, arrived at that part of the verdict. Thus three of A.B.'s five statements are off the table as not appropriate for any consideration by Judge Bernhardt on the motion for a new trial. Their consideration was barred by Lord Mansfield's Rule.

What remain for consideration, however, are A.B.'s statement that he "did some online research" and his closely related statement that he "found out that there are companies that provide fumigation services." They are the sum total of evidence to be considered.

### Was There Even an Infraction?

In his Order dismissing the appellant's Motion For a Partial Retrial, Judge Bernhardt commented, "Counsel's affidavit does not include any indication that the juror told him that the online research occurred during the trial." Because A.B. spoke to Whitney almost immediately after the trial was over, we readily agree that the online research did not occur after the trial was over. That still leaves two possibilities. If A.B. had done his online research before the trial started, that would not have been a violation of the judge's instructions to the jury not to do such independent investigation. Although in-trial online research might seem to have been more likely than pretrial online research, the trial judge

was not obliged to engage in speculation or guesswork in that regard. The burden of proof is on the moving party. A lot was left unsaid by the only source of evidence. It is not for us to speculate as to what his answers might have been, had A.B. been produced as a witness before Judge Bernhardt and subjected to more detailed examination.

The contention may be twice-curst. Even if, _arguendo_, the online research had occurred during the course of the trial, at what point more precisely did the infraction occur? If the online research had been done by A.B. at home during an overnight break in the trial, that might have been evidence of an infraction at least worthy of further consideration. If, on the other hand, A.B. had, as many people frequently do in all kinds of circumstances, picked up his cellphone and done some online research in the jury room in the middle of the jury's deliberations, such a revelation would be getting back again into the forbidden territory of Lord Mansfield's Rule. An internal infraction in the midst of the collective deliberative process is not the same thing as an extraneous infraction committed at home. Again, A.B. left us, and Judge Bernhardt, with nothing but speculation.

The contention may, indeed, be thrice-curst. Even 1) assuming, _arguendo_, that the online research occurred in the course of (and not before) the trial and even 2) further assuming, _arguendo_, that the online research had been done at home during an overnight break, where does that leave the appellant in terms of proving prejudice? In the opinion accompanying his Order, Judge Bernhardt noted that "there is no basis to believe that the information was shared with other jurors, discussed during deliberations, or impacted the

deliberations or verdict." The appellant had to show that it probably did happen, not that it might possibly have happened. Smith v. Pearre, 96 Md. App. at 391. Prejudice, even if present, is something that is measured quantitatively. The possible taint of extraneous information influencing the deliberative process of one juror is quantitatively not as great as the taint of extraneous information influencing the deliberative process of twelve jurors. Indeed, it is only 1/12 as great. The caselaw is rife with considerations of whether one juror's improperly obtained information was or was not shared with other jurors. See, e.g., Harford Sands, Inc. v. Groft, 320 Md. at 144.

In assessing prejudice, moreover, at least in a civil case, Wernsing, 298 Md. at 419-20, demands that the trial judge "look to the probability of prejudice from the face of the extraneous matter in relation to the circumstances of the particular case." In that regard and without going into any unnecessary detail, the appellee reminds us that fumigation was at least mentioned in the record as a possible anti-bedbug measure and that the record is replete with evidence of the appellant's almost cavalier abandonment of all her personal property, including many things, such as metallic kitchen utensils, that could not be infested by bedbugs. See Harford Sands, Inc. v. Groft, 320 Md. at 148-50, Smith v. Pearre, 96 Md. App. at 391.

In any event and even if, arguendo, the online research by A.B. were a proper fact for consideration, Judge Bernhardt found that the appellant had not suffered sufficient prejudice to warrant a new trial. It is certainly not something that, in a civil case at least, will be

presumed. Our standard of review is a deferential one. We cannot say that Judge Bernhardt's findings of fact were clearly erroneous. We cannot say that Judge Bernhardt's final ruling was an abuse of discretion. We affirm.

## In A Nutshell

The law is not static. In the context of Lord Mansfield's Rule and elsewhere, there has emerged over the last 50 years a special solicitude for convicted criminals that does not extend to unsuccessful litigants in civil cases. That this development is driving a wedge between the handling of civil and criminal trials should not be surprising. Neither should it be ignored.

**JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.**